## CASSEDY *v.* WELLS, JONES, WELLS & LIPSCOMB.

(Division A. November 2, 1931.)

[137 So. 472. No. 29494.]

Butler & Snow, of Jackson, for appellant.

106

Geo. R. Nobles, of Jackson, for appellee.

Argued orally by **Geo. Butler,** for appellant, and by **George R. Nobles,** for appellee.

**Cook, J.,** delivered the opinion of the court.

J. A. Logue, a trusted employee of the First National Bank of Jackson, Mississippi, defaulted for a large sum of money, and he employed the firm of Wells, Jones, Wells & Lipscomb to defend him in threatened criminal prosecutions growing out of said defalcation, and contracted to pay them a fee of one thousand dollars, for which sum he and his wife, Julia Casey Logue, executed their promissory note in favor of said attorneys, payable thirty days after date, and procured the same to be indorsed by F. J. Casey, Mrs. Logue's father. He also employed the firm of Franklin & Easterling, and James W. Cassedy, attorneys, to represent him in certain civil

litigation which was begun between Logue and the said bank, and also to assist in the defense of the criminal charges against him, and contracted to pay these attorneys a fee of ten thousand dollars, nine thousand dollars of which was afterwards paid out of the proceeds of certain property belonging to Logue.

Thereafter Logue was convicted, or pleaded guilty to the criminal charges pending against him in the federal district court and was sentenced to serve a term in the federal penitentiary at Atlanta, Georgia. The testimony is to the effect that he had no means and was greatly distressed over the fact that he was leaving his wife and children without means or any provisions for their support and maintenance while he was incarcerated in the penitentiary, and that on the day before he was taken to Atlanta to begin his term of imprisonment he appealed to James W. Cassedy and J. E. Franklin, two of his attorneys, for assistance in providing necessities for his wife and children while he was away. Mr. and Mrs. Logue held a conference with Messrs. Cassedy and Franklin on the night before Mr. Logue was to leave the next morning. At this conference, it was suggested that Mr. Lee Hart, Logue's friend, who had aided him in the past, might be willing to again lend financial assistance to Mrs. Logue in these distressing circumstances. Mr. Logue thereupon communicated with Mr. Hart, and later in the evening both Mr. and Mrs. Logue visited Mr. Hart at his residence. According to the testimony of Mr. Franklin, when Logue and his wife returned from this interview, they reported that Mr. Hart had agreed to furnish Mrs. Logue from time to time, as her necessities required, the sum of one thousand two hundred fifty dollars, if Logue and his wife would execute to him their promissory note for that sum indorsed by James W. Cassedy and J. E. Franklin. Accordingly, on the 15th day of May, 1929, the said J. A. Logue and his wife, Mrs. Julia Casey Logue, executed their note for one thousand

two hundred fifty dollars, payable to "ourselves or bearer," due January 1, 1930, bearing interest at eight per cent from maturity until paid, and indorsed the same by writing their names on the back thereof; and it was thereupon indorsed by the said Cassedy and Franklin, and delivered to Mrs. Logue to be negotiated as aforesaid.

When Mrs. Logue again took the matter up with Mr. Hart the following day, he informed her that he was leaving for Europe, and could not give the matter his personal attention, but had left instructions in reference thereto with the officials of the Deposit Guaranty Bank & Trust Company; but, when she took it up with the officials of this bank, they declined to accept the note or advance her any money thereon. Several days later, according to Mr. Franklin's testimony, Mrs. Logue reported these facts to him, and thereafter he heard nothing further of the note until after the death of Mr. Cassedy, when it was probated against the Cassedy estate.

In the meantime, and prior to July 13, 1929, Mrs. Logue went to Major Calvin Wells, a member of the firm of Wells, Jones, Wells & Lipscomb, and told him she had the note; that she had expected Mr. Hart to discount it, or to arrange to have it discounted at the Deposit Guaranty Bank & Trust Company, but he had not done so and had gone to Europe; and she requested Major Wells to try to discount it for her at some other bank in Jackson. Thereupon Major Wells attempted to have the note discounted at a Jackson bank, but failed. He then went to Brookhaven, the home of J. W. Cassedy, one of the indorsers, and endeavored to discount it at two banks, but failed again. Later Mrs. Logue requested Major Wells to take the note and give her therefor two hundred fifty dollars in cash, and cancel the one thousand dollar note which her husband and she had given his firm for attorney's fees; and this he agreed to do. Accordingly he paid Mrs. Logue two hundred fifty dollars in cash, and

surrendered the one thousand dollar note, which had been executed for attorney's fees, and took her written transfer of the note for one thousand two hundred fifty dollars, dated May 15, 1929, and indorsed by Messrs. Cassedy and Franklin.

After the death of James W. Cassedy, the firm of Wells, Jones, Wells & Lipscomb, appellees herein, probated the said note against the estate of James W. Cassedy, deceased, by having W. Calvin Wells, III, make the required statutory affidavit thereto, and thereafter the administratrix of the estate, appellant herein, filed her contest and objections to the allowance of the claim, wherein, among other things, she charged that the note was indorsed upon the conditions and for the purposes hereinbefore stated, and for no other purpose; that such was understood and agreed by the parties to the said note, and that the appellees had full knowledge of the purpose for which said note was indorsed by the decedent, and of the agreements of all the parties relating thereto, when they paid to Mrs. Logue the sum of two hundred fifty dollars in cash and surrendered the one thousand dollar note executed to them by Logue and his wife for attorney's fees, and took the assignment of the said one thousand two hundred fifty dollar note; that, since the said two hundred fifty dollars so paid was probably used by Mrs. Logue for living expenses for herself and children, the claim would not be contested to the extent of two hundred fifty dollars, but only as to the balance of one thousand dollars; and that the holders of the note were not innocent purchasers for value without notice, and in no event were entitled to a sum in excess of two hundred fifty dollars by reason of the indorsement by decedent on said note.

From the testimony offered at the hearing of the contest of the appellee's claim, it appeared that, at the time he purchased the note for his firm, Major Wells knew of the dire financial distress of Mrs. Logue. He testified

that Mrs. Logue told him that she thought Mr. Lee Hart would discount the note, or make arrangements at the bank for it to be discounted, but he had gone to Europe without doing so, and that the note had been executed and indorsed for the purpose of enabling her to get some money on it, but that he had no knowledge whatever of any conditions attached to the note or agreement between the parties thereto, or any limitation upon the right to negotiate the note, or upon the use by Mrs. Logue of the money derived therefrom.

In her testimony, Mrs. Logue denied that the note was executed for the specific purpose of being left with Mr. Hart, upon which he would from time to time advance her money to buy necessities for herself and children, but testified that, while the note was executed for the purpose of enabling her to get money thereon, there was no agreement with the indorsers as to what she would do with the note or the money received therefor.

Upon the proof, the chancellor held that there was no evidence that the holders of the note had any knowledge of the alleged conditions under which the note was executed, or of any infirmity therein, and that they were holders of the note in due course, and rendered a decree overruling the objections and allowing the claim, and rendered a personal judgment against the estate for one thousand two hundred fifty dollars with interest and costs, and from this decree the administratrix appealed.

The first question for consideration is whether or not appellees are holders in due course of the note in question. Upon this question, the contentions of the appellant are that the title of Mrs. Logue to the note was defective, because she negotiated it in breach of faith, or under such circumstances as amounted to fraud, and that the appellees failed to meet the burden that was consequently upon them of proving that they took the note in good faith, and without notice of the defect in the title of Mrs. Logue, and were holders in due course; but

that, on the contrary, in view of their relation with Mrs. Logue and their knowledge of the circumstances attending the transaction, they are charged with notice.

The applicable provisions of the Negotiable Instruments Law which must be kept in view in the consideration of this question are found in sections 2708, 2711, 2712, 2713, and 2715, Code 1930. Section 2708, Code 1930, defines a holder in due course as one who has taken an instrument under the following conditions: "(1) That it is complete and regular upon its face. (2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact. (3) That he took it in good faith and for value. (4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 2711, Code 1930, provides that: "The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to fraud," while section 2712 provides, among other things, that "In the hands of any holder other than a holder in due course, a negotiable instrument is subject to the same defenses as if it were non-negotiable."

Who shall be deemed a holder in due course is set forth in section 2713, Code 1930, which reads as follows: "*Who Deemed Holder in Due Course.*—Every holder is deemed prima facie to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. But the last mentioned rule does not apply in favor of

a party who became bound on the instrument prior to the acquisition of such defective title.''

Section 2715, Code 1930, provides what shall constitute notice of a defect in an instrument in the following language: *"What Constitutes Notice of Defect.*—To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith.''

The chancellor found upon evidence which fully supports the conclusion that the indorsement of the note in question was purely for the accommodation of the makers and upon the conditions stated by the witness Franklin. The existence of the condition being therefore established, it cannot be doubted that the negotiation of the note by the maker for whose special benefit it was executed, in violation of the conditions and the agreement of the parties to the note, to a person and for purposes other than those named in the condition and agreement, was a breach of faith on the part of the maker within the meaning of section 2711, Code 1930, and of such character as rendered her title to the note defective, and would defeat the liability of the indorsers to any holder of the note other than a holder in due course. This being true, the burden was upon the appellees to prove that they were holders in due course.

Upon this point the appellant presents two contentions: First, that the proof fails to show want of notice to Major Wells at the time he purchased the note for appellees; and, second, that it fails to show that the other partners of the appellee firm had no notice of the conditional indorsement to the defective title of Mrs. Logue when she negotiated it.

The uncontradicted testimony of both Major Wells and Mrs. Logue was to the effect that Major Wells had no

actual knowledge or notice of the undisclosed condition or infirmity in the note, or defect in the title of Mrs. Logue, and we do not think there are any facts or circumstances in evidence that show that he had "knowledge of such facts that his action in taking the instrument amounted to bad faith." It is true that a purchaser of a negotiable promissory note cannot willfully shut his eyes to the surrounding circumstances, or to information or means of information, or knowledge, which he knows are at hand, or has reasonable cause to believe would show a defect in the note, or want of title; but there are no circumstances shown in this record that required the purchaser to institute an inquiry as to possible defenses. It is true that the relation of attorney and client existed between the appellees and the makers of the note, and that, as a result of this relation and information furnished him by Mrs. Logue, Major Wells knew of the necessitous circumstances and financial embarrassment of the maker who was negotiating the note, but financial necessity requiring indorsement of commercial paper and its negotiation is not notice to the purchaser that the indorsement was subject to conditions, and is not of itself sufficient to require inquiry as to the defects in the paper or want of title in the one negotiating it.

The appellant next contends that it was incumbent upon the appellees to show the good faith and want of notice of each of the partners composing the firm. In support of this contention, there is cited only a statement of the text of Corpus Juris in volume 8, at page 986, to the effect that: "If the holders are partners the good faith of all must be shown." The only cases cited in the footnotes as supporting this text are from the Supreme Court of Iowa.

In the case of Frank v. Blake, 58 Iowa, 750, 13 N. W. 50, it was held that, where the transferee of a fraudulent note seeking to recover thereon is a partnership, the burden is on the partnership to show that all the members

thereof were ignorant of the fraud at the time of the purchase. In the case of Bennett State Bank v. Schloesser, 101 Iowa, 571, 70 N. W. 705, it was held that "evidence by a cashier of a bank that in the purchase of a note neither he nor the other officers of the bank had notice of matters pleaded by defendant as a defense to the note, was not conclusive evidence that the other officers had no notice thereof," and that, under such circumstances, the question of notice and good faith in making the purchase of notes by a partnership or bank is one for the jury. In the case of Des Moines Savings Bank v. Arthur, 163 Iowa, 205, 143 N. W. 556, 560, Ann. Cas. 1916C, 498, only the president of the bank testified to the absence of notice that the note involved had been paid, and that the transaction was with him; and the court held that, "though his evidence may not have established the absence of notice conclusively, it was sufficient to justify the finding that the bank was without notice in acquiring the paper," and that such evidence was sufficient to meet the burden that was on the plaintiff to show want of notice and established the status of the bank as that of a holder of the note in due course. In the case of Perry Sav. Bank v. Fitzgerald, 167 Iowa, 446, 149 N. W. 497, some of the officers of the corporation testified, but not all, and the undisputed evidence showed that the cashier was the only officer purchasing notes, and that he was the only one who had to do with the purchase of the note involved, and it was held that under such circumstances the holdings are that the burden is met by this evidence, in the absence of other circumstances.

From the latter cases touching the rule as applied to corporations, we think the proper rule applicable to both corporations and partnerships may be deduced. In the absence of opposing circumstances, testimony that the transaction by which a negotiable instrument was acquired was wholly with one member of the partnership

or officer of a corporation, who had no notice of defects in, or defenses to, the instrument, and that it was begun and concluded by him without the aid or suggestion of other members of the partnership or officers of the corporation, makes a prima facie showing of want of notice to the partnership or corporation. In the case at bar, the testimony of Major Wells tends to show that the negotiations with Mrs. Logue by which the note was acquired for his firm were conducted and concluded by him; but it wholly fails to show that he did not consult with, and act upon the advice and at the suggestion of, the other members of his firm; and the record is silent as to the knowledge of, or notice to, the members of the firm other than Major Wells; consequently we think the appellees failed to meet the burden of showing that they were holders in due course.

The next point argued by the appellant is that the attempted probate of the note is a nullity; the contention being that, under the statute requiring the creditor to make affidavit to his claim, each member of the partnership was required to make such an affidavit, and that, since the affidavit attached to the note was made by only one member of the firm of Wells, Jones, Wells & Lipscomb, it is wholly insufficient. It will be unnecessary to here decide whether the claim of a partnership against the estate of a decedent may be proved for probate by the affidavit of one partner. By chapter 157, Laws 1926, section 1672, Code 1930, provision was made for the amendment of a defective or insufficient affidavit attempting in good faith to probate a claim against the estate of a decedent; the provision of this section upon this point being as follows: "Where the affidavit is made in good faith and the claim is registered, probated and allowed by the clerk, but the affidavit is defective or insufficient, the court may allow the affidavit amended so as to conform to the requirements of the statute, at any time before the estate is finally settled, whereupon the probate

shall be as effective and the claim as valid against the estate as if the affidavit had been correct and sufficient, in the first instance.''

If objection had been made to the affidavit in the court below, it could have been promptly amended; and, since no objection thereto was there made, the question of the sufficiency of the affidavit cannot be raised for the first time in this court.

The court below entered a decree allowing the claim, and entered a monetary decree against the administratrix for one thousand two hundred fifty dollars, the full amount of the claim, with interest and costs, and the appellant assigns as error the action of the court in rendering a monetary decree against her. In the case of Bell v. Faison, 53 Miss. 354, it was held that, upon the hearing of an administrator's contest of a claim presented against the estate of a decedent, no decree can be made except that the claim contested ''be allowed or disallowed,'' and that a monetary judgment against the administrator for the sum for which the claim was allowed was erroneous. It was therefore error to enter a monetary judgment against the appellant for the amount of the appellee's claim; and, for the errors therein indicated, the decree of the court below will be reversed, and the cause remanded.

Reversed and remanded.